# ALLIED CORPORATION

v.

## The UNITED STATES.

## CASTLE & COOKE, INC.

v.

## The UNITED STATES.

## REYNOLDS METALS COMPANY

v.

## The UNITED STATES.

### Nos. 120–81T, 78–80T and 445–81T.

United States Court of Claims.

July 28, 1982.

Karl R. Price, Washington, D. C., attorney of record, for plaintiff in No. 120–81T. W. F. Loftus and Ivins, Phillips & Barker, Washington, D. C., of counsel.

Paul H. Dawes, San Francisco, Cal., attorney of record, for plaintiff in No. 78–80T. George E. Link, Mary E. Butler, and Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., of counsel.

Robert D. Heyde, Washington, D. C., for plaintiff in No. 445–81T; Raphael Sherfy, Washington, D. C., attorney of record. Hugh C. Stromswold, Charles J. Monahan, Thomas D. Johnston, and Miller & Chevalier, Chartered, Washington, D. C., of counsel.

Mildred L. Seidman, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D. C., for defendant. Theodore D. Peyser and Bruce W. Reynolds, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and SMITH, Judges.

## ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

KASHIWA, Judge:

These three cases are before the court on cross motions for summary judgment and partial summary judgment. All three concern the proper calculation method of the deduction granted Western Hemisphere trade corporations[1] (hereinafter WHTCs) when consolidated federal income tax returns are filed. One also concerns the ability of a corporation denied an otherwise proper deduction because of a change in accounting method to capitalize that expense. After careful consideration of the parties' submissions and after oral argument, we grant summary judgment for the plaintiffs in all cases.

I

 A. Allied Corporation is the parent corporation of an affiliated group that filed consolidated federal income tax returns for 1971 and subsequent years. Allied's affiliated group includes three WHTCs and numerous non-WHTCs. None of the WHTCs suffered net losses for 1971, while 12 of the

---

1. Western Hemisphere trade corporations are defined by section 921 of the Internal Revenue Code. It provides:

"§ 921. *Definition of Western Hemisphere trade corporations*

"For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

"(1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and

"(2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

For any taxable year beginning prior to January 1, 1954, the determination as to whether any corporation meets the requirements of section 109 of the Internal Revenue Code of 1939 shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning prior to January 1, 1954."

non-WHTCs had net losses. On March 9, 1979, Allied filed a timely claim for refund of 1971 taxes of $1,224,404 based on a foreign tax carryback for 1973. In a 30-day letter and supplemental Revenue Agent's report for 1971, issued March 4, 1980, the Internal Revenue Service (IRS) approved the carryback as claimed by Allied but approved a tax refund to the extent of only $1,208,401. The Service's reduction in the overpayment of tax was attributable to its disallowance of a 1971 trona depletion deduction which had previously been claimed and allowed. None of the refund has yet been paid.

Allied does not challenge the validity of the Service's adjustment with respect to the trona depletion deduction but maintains it is entitled to an increase in the refund amount because the IRS miscalculated the WHTC deduction in the Revenue Agent's report. The IRS calculated the section 922 deduction according to Treas.Reg. § 1.1502–25. Plaintiff contends it was improper for the IRS to do this since this court invalidated that regulation. *American Standard v. United States,* 220 Ct.Cl. 411, 602 F.2d 256 (1979), rehearing *en banc* denied (Oct. 12, 1979), and *Union Carbide v. United States,* 222 Ct.Cl. 75, 612 F.2d 558 (1979). Plaintiff claims the methods indorsed by these cases, the aggregate method with losses and the fractional method with losses, are the proper methods for calculating the deduction and result in an increase in Allied's tax refund for 1971.

Reynolds Metals is the parent corporation of an affiliated group that in the year 1967 included four WHTCs and 21 non-WHTCs. None of the four WHTCs had net losses in 1967 but several of the non-WHTCs had net operating losses. The IRS calculated the WHTC deduction for 1967 in the manner prescribed by Treas.Reg. § 1.1502–25. Reynolds, like Allied, alleges this method of calculation has been invalidated by the

*American Standard* and *Union Carbide* decisions. Reynolds filed a timely amended return and refund claim for 1967 and is now suing in this court for a federal income tax refund.

Prior to oral argument the Government requested initial hearing *en banc* in *Allied, Reynolds,* and *Castle & Cooke* (discussed in part II of this opinion) so that we might reconsider our decision in *American Standard.* The request for initial hearing *en banc* was denied in all three cases.

B. 26 U.S.C. § 1501 of the Internal Revenue Code of 1954 (hereinafter all section references are to the Internal Revenue Code of 1954) permits affiliated corporations to be treated as a single corporate entity for purposes of the federal income tax. In section 1502 Congress delegated its authority over the filing of consolidated tax returns to the Secretary. The Secretary's authority, however, is limited. Section 1502 states:

> The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, *in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability,* and in order to prevent avoidance of such tax liability. [Emphasis supplied.]

Treas.Reg. § 1.1502–25 was promulgated by the Secretary to control the treatment of the special deduction granted by section 922 for WHTCs when consolidated returns are filed. Under section 922 a WHTC is allowed a deduction which is a specified fraction of the taxable income of the WHTC.[2]

---

**2.** Section 922 provides:

"§ 922. *Special deduction*

"In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows—

"(1) First determine the taxable income of such corporation computed without regard to this section.

"(2) Then multiply the amount determined under paragraph (1) by the fraction—

When consolidated returns are filed, Treas. Reg. § 1.1502–25(c) provides a method to determine the base figure to which the fraction specified in section 922 is applied.[3] This method has become known as the fractional method without losses. Under this method the aggregate of WHTC taxable income is first divided by the aggregate of all consolidated group members' taxable income. The last sentence of Treas.Reg. § 1.1502–25(c) provides that if the taxable income of a member of the affiliated group results in an excess of deductions over gross income, then for purposes of the fraction such member's taxable income shall be zero. The result of the division is then multiplied

"(A) the numerator of which is 14 percent, and

"(B) the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11." Sections 921 and 922 have been repealed by Pub.L. 94–455, Title X, § 1052(b), Oct. 4, 1976, 90 Stat. 1648, for all taxable years beginning after December 31, 1979.

3. Treas.Reg. § 1.1502–25 provides:

"§ 1.1502–25. *Consolidated section 922 deduction*

"(a) *In general.* The consolidated section 922 deduction for the taxable year shall be determined by multiplying the fraction specified in section 922(2) by that portion of the consolidated taxable income attributable to those members of the group which are Western Hemisphere trade corporations for such year.

"(b) *Definition of Western Hemisphere trade corporation.* For purposes of paragraph (a) of this section, in determining whether a member is a Western Hemisphere trade corporation, the definition contained in section 921 shall be applied to such member separately. For purposes of applying the gross income tests of section 921 to such member, the gross income of such member for a consolidated return year shall be determined as if such member had filed a separate return, except that—

"(1) Gains and losses on intercompany transactions shall be reflected in gross income in the manner provided by § 1.1502–13;

"(2) Gains (not including dividends) and losses on transactions with respect to stock, bonds, or other obligations of members of the group shall be reflected in gross income in the manner provided by §§ 1.1502–14 and 1.1502–19; and

"(3) The adjustments prescribed by §§ 1.1502–18 and 1.1502–32 shall be made.

"(c) *Portion of consolidated taxable income attributable to Western Hemisphere trade cor-*

by the consolidated taxable income determined without the WHTC deduction.

This court in *American Standard* invalidated the last sentence of Treas.Reg. § 1.1502–25(c) on two grounds. First, we found the method of calculation provided by the regulation invalid. This court said:

* * * Though there may be many reasonable methods to determine a group's tax liability and the Secretary's authority is absolute when it represents a choice between such methods, the statute does not authorize the Secretary to choose a method that imposes a tax on income that would not otherwise be taxed. * * * [220 Ct.Cl. at 417, 602 F.2d at 261.]

*porations.* (1) *In general.* For purposes of paragraph (a) of this section, the portion of the consolidated taxable income attributable to those members of the group which are Western Hemisphere trade corporations is an amount equal to the consolidated taxable income (computed without regard to the section 922 deduction) multiplied by a fraction, the numerator of which is the sum of the taxable incomes of those members which are Western Hemisphere trade corporations, and the denominator of which is the sum of the taxable incomes of all the members.

"(2) *Taxable income.* For purposes of this paragraph, the taxable income of a member shall be the separate taxable income determined under § 1.1502–12, adjusted for the following items taken into account in the computation of consolidated taxable income:

"(i) The portion of the consolidated net operating loss deduction, the consolidated charitable contributions deduction, and the consolidated dividends received deduction, attributable to such member;

"(ii) Such member's *capital gain net income (net capital gain for taxable years beginning before January 1, 1977)* (determined without regard to any net capital loss carryover or carryback attributable to such member); [Footnote omitted; emphasis in original.]

"(iii) Such member's net capital loss and section 1231 net loss, reduced by the portion of the consolidated net capital loss attributable to such member; and

"(iv) The portion of any consolidated net capital loss carryover or carryback attributable to such member which is absorbed in the taxable year.

If the computation of the taxable income of a member under this subparagraph results in an excess of deductions over gross income, then for purposes of subparagraph (1) of this paragraph such member's taxable income shall be zero."

We found the method prescribed by the regulation, treating net losses as zero, had the effect of allocating non-WHTC losses to WHTCs or WHTC losses to non-WHTCs. As a result, the base figure arrived at bore little resemblance to the actual WHTC taxable income of the affiliated group. We held:

> * * * the regulation changes the conceptual basis upon which Congress permitted the deduction in section 922. * * [220 Ct.Cl. at 424, 602 F.2d at 265.]

The second reason the last sentence of Treas.Reg. § 1.1502–25(c) was invalidated was the Secretary's failure to comply with the notice requirements of the Administrative Procedure Act when promulgating the regulation. Our decision in *American Standard* approved two alternative methods for calculating the WHTC deduction when consolidated returns are filed. They are the fractional method with losses and the aggregate method with losses.[4]

The Government has failed to draw any distinction between the factual situation in *American Standard* and that in *Allied* and *Reynolds*. We are bound by and affirm our decision in *American Standard*. We, therefore, hold the IRS was incorrect in applying Treas.Reg. § 1.1502–25(c) to determine Allied's and Reynold's WHTC deduction. We find the fractional method with losses and the aggregate method with losses to be the proper ways to determine the WHTC deduction when consolidated returns are filed.

II

During the taxable years 1968 through 1974, Castle & Cooke was the common parent of an affiliated group that included one WHTC. For the years in question, a consolidated return was filed by the Castle & Cooke affiliated group. As with Allied and Reynolds, the IRS calculated the WHTC deduction provided by section 922 in accord with Treas.Reg. § 1.1502–25. As we have stated above, we held this regulation invalid in *American Standard*. A special situation not present in *American Standard*, however, is posed by *Castle & Cooke*. During the years 1971 and 1974, the WHTC in Castle & Cooke's affiliated group suffered a net operating loss. No net operating losses had been suffered by the WHTCs in *American Standard* and *Union Carbide*. We must decide how the net operating loss should be carried forward and carried back for purposes of determining the WHTC deduction.

The Government contends our *American Standard* opinion supports three separate possible ways of determining a WHTC's net operating loss (NOL) carryback and carryforward. The first method the Government suggests is to treat the WHTC as a separate entity for purposes of carrying the NOL. Under this method NOL carryovers and carrybacks are not limited by the consolidated NOL. It contends the underlying rationale of *American Standard* supports this method. We reject this. *American Standard* recognized that the filing of con-

---

**4.** The aggregate method with losses provides that the base figure for calculating the section 922 deduction is the aggregate or net of the taxable income of each member of the affiliated group which is a WHTC. The taxable income of a member is computed on the basis of the member's "separate taxable income" as defined by Treas.Reg. § 1.1502–12 to which adjustment is made for those consolidated items of income and deduction which are actually attributable to it. The aggregate of the taxable income of all WHTCs including those with net losses is considered.

The fractional method with losses provides that the base figure for calculating the section 922 deduction is a fraction of the consolidated taxable income determined without regard to the WHTC deduction. The numerator of the fraction is the aggregate of the WHTCs' taxable income. The denominator is the aggregate of all the members' taxable income. The taxable income of a member is its separate taxable income to which adjustment is made for those consolidated items of income and deduction which are actually attributable to it. The aggregate in both the numerator and denominator includes those corporations with net losses as well as net gains.

The fractional method with losses and the aggregate method with losses usually produce the same result. A different result could be produced where an affiliated group claims a consolidated section 247 deduction, Treas.Reg. § 1.1502–27, for dividends paid by public utilities on certain preferred stock. None of the corporations involved in these three cases has claimed such a deduction.

solidated returns may cause changes in income tax liability. We said:

> * * * To the extent of the initial calculation of taxable income, it is a clearly reasonable answer to the needs of consolidated returns to treat [WHTCs] in the same way as other corporations. Though such treatment can change the character and/or amount of income and deductions because of the consolidation of certain items, this is the treatment all corporations are subject to when they elect the privilege of filing consolidated returns. [220 Ct.Cl. at 420, 602 F.2d at 262–263. Footnote omitted.]

*American Standard* was simply concerned that the regulation in question caused income that was not taxed by the Code to be taxed by regulation. As a result, we held this regulation penalized those WHTC corporations that chose to file consolidated returns.

The second alternative the Government suggests focuses upon the first sentence of footnote 11 of *American Standard.* There we said:

> The amount of a consolidated item attributable to a member is the amount actually contributed limited by the amount actually allowed as a deduction from consolidated taxable income in that taxable year. * * * [220 Ct.Cl. at 422 n.11, 602 F.2d at 263–264 n.11.]

From this one sentence, the Government derives a method of carrying the NOL forward and back.[5] We reject this method for it takes one sentence of the *American Standard* opinion out of context. At oral argument, the Government itself said it would not support this method.

The third method the Government suggests is supported by *American Standard* is the very one the plaintiff supports. This is the method used by Treas.Reg. § 1.1502–79. We find this is the appropriate method for WHTCs' net operating losses to be carried back and carried forward. *What we found invalid in the method of calculation used by Treas.Reg. § 1.1502–25(c) was only the last sentence of that regulation, treating a member's taxable income as equivalent to zero if it was a net loss.* Under § 1.1502–25(c)(iv), all members' separate taxable income is adjusted for "[t]he portion of any consolidated net capital loss carryover or carryback attributable to such member which is absorbed in the taxable year." Treas.Reg. § 1.1502–79(a) prescribes the method for calculation of NOL carryovers and carrybacks.[6] The basic formula provided by this regulation is as follows:

---

**5.** The Government describes this proposed method as follows:

> "* * * In 1971 Standard Fruit had a loss of $5,190,437. This loss was partially offset by income of non-WHTCs in that year, so that taking into account both income and loss of other members of the group the consolidated net operating loss available for carryback was $3,086,513. Applying the first sentence of footnote 11, the amount of the 1971 net operating loss 'actually contributed' by Standard Fruit, since offsetting of WHTC losses against non-WHTC income is not permissible, is $5,190,437. However, this amount is 'limited by the amount actually allowed as a deduction from consolidated taxable income in the taxable year,' or $3,086,513. On this basis, the portion of 1968 consolidated taxable income attributable to the WHTC would be $9,512,177, less the $3,086,513 1971 net operating loss carryback attributable to Standard Fruit. On this reading of *American Standard,* plaintiff would be entitled to no recovery for 1968." Defendant's brief in support of its cross motion for partial summary judgment at 32.

**6.** Treas.Reg. § 1.1502–79(a) provides in pertinent part:

> "§ 1.1502–79. *Separate return years*
>
> "(a) *Carryover and carryback of consolidated net operating losses to separate return years* —(1) *In general.* (i) If a consolidated net operating loss can be carried under the principles of section 172(b) and paragraph (b) of § 1.1502–21 to a separate return year of a corporation (or could have been so carried if such corporation were in existence) which was a member in the year in which such loss arose, then the portion of such consolidated net operating loss attributable to such corporation (as determined under subparagraph (3) of this paragraph) shall be apportioned to such corporation (and any successor to such corporation in a transaction to which section 381(a) applies) and shall be a net operating loss carryover or carryback to such separate return year; accordingly, such portion shall not be included in the consolidated net operating loss carryovers or carrybacks to the equivalent consolidated return year. Thus, for example, if a member filed a separate return for the third year preceding a consolidat-

$$\frac{\text{NOL contributed by the corporation}}{\text{Aggregate of the separate NOLs}} \times \text{Consolidated NOL} = \text{NOL to be carried forward and back}$$

Treas.Reg. §§ 1.1502–25(c)(iv) and 1.1502–79(a) were not invalidated by *American Standard.* We find the method prescribed by § 1.1502–79(a) is the appropriate mechanism for determining a WHTC's NOL carryback and carryover. The use of § 1.1502–79(a) is supported by our opinion in *American Standard.* In note 11 of that opinion, we said:

> The amount of a consolidated item attributable to a member is the amount actually contributed limited by the amount actually allowed as a deduction from consolidated taxable income in that taxable year. *This is probably calculated by the same method provided by Treas. Reg. § 1.1502–79 for determining the amount of such items that can be carried over by a member to separate taxable years. The basic method provided for the consolidated net operating loss deduction,* charitable contributions deduction, and consolidated dividends received deduction *is a fraction, the member's actual contribution over the entire group's contribution, times the consolidated amount taken into account in computing consolidated taxable income in that year.* [Last three words, "in that year," also emphasized in original.] * * * [220 Ct.Cl. at 422 n.11,

602 F.2d at 263–264 n.11. Emphasis supplied.]

And in footnote 16 we said in pertinent part:

> The only distortion caused by consolidation on the WHTC deduction which we perceive is that a greater benefit can be obtained by WHTCs' having alternative profit and loss years, and *the losses of WHTCs are offset against the profits of all other corporations in that year and are not carried over to years in which there is WHTC income except to the extent of consolidated net operating losses attributable to the WHTCs.* If separate returns were filed, such losses would be carried over to other tax years causing the deduction to be recomputed on the basis of the recomputed taxable income. *Cf. Motors Ins. Corp. v. United States,* 208 Ct.Cl. 571, 530 F.2d 864 (1976) (recomputation of the foreign tax credit). [220 Ct.Cl. at 425 n.16, 602 F.2d at 265 n.16. Emphasis supplied.]

The Government concedes that both notes 11 and 16 of *American Standard* support the use of Treas.Reg. § 1.1502–79(a) for calculation of a WHTC's NOL carryover and carryback. Defendant's brief in support of its cross motion for partial summary judgment at 31, 32–33.

Thus, we hold the formula prescribed by Treas.Reg. § 1.1502–79(a) is the appropriate

ed return year in which a consolidated net operating loss was sustained and if any portion of such loss is apportioned to such member for such separate return year, such portion may not be carried back by the group to its third year preceding such consolidated return year.

* * * * * *

"(3) *Portion of consolidated net operating loss attributable to a member.* The portion of a consolidated net operating loss attributable to a member of a group is an amount equal to the consolidated net operating loss multiplied by a fraction, the numerator of which is the separate net operating loss of such corporation, and the denominator of which is the sum of the separate net operating losses of all members of the group in such year having such losses. For purposes of this subparagraph, the separate net operating loss of a member of the group shall be determined under § 1.1502–12 (except that no deduction shall be allowed under section 242), adjusted for the following items taken

into account in the computation of the consolidated net operating loss:

"(i) The portion of the consolidated dividends received deduction, the consolidated charitable contributions deductions, and the consolidated section 247 deduction, attributable to such member;

"(ii) Such member's *capital gain net income (net capital gain for taxable years beginning before January 1, 1977)* (determined without regard to any net capital loss carryover attributable to such member);

"(iii) Such member's net capital loss and section 1231 net loss, reduced by the portion of the consolidated net capital loss attributable to such member (as determined under paragraph (b)(2) of this section); and

"(iv) The portion of any consolidated net capital loss carryover attributable to such member which is absorbed in the taxable year." [Footnote omitted; emphasis in original.]

method for determining Castle & Cooke's WHTC's NOL carrybacks and carryovers.

## III

▮ Ewa Sugar Co., Inc., was a member of plaintiff Castle & Cooke's affiliated group. During the years 1932 through 1936, Ewa's predecessor used the crop method of accounting for federal income tax purposes. This method was used in an attempt to match income and expenses over the long period of time it takes to grow, harvest, and sell sugar cane. Under the crop method, Ewa's predecessor deducted 51.7 percent of current (direct and indirect) costs currently, 33.6 percent of these costs in the second year, and the remaining 14.7 percent of these costs in the third year. In 1937 Ewa's predecessor applied for and received permission from the Commissioner to change its accounting method from the crop method to the annual accrual method. Ewa's predecessor sought this change so its method of accounting for its books would more closely conform to its accounting method for federal income tax purposes. The Commissioner's letter granting permission stated in pertinent part:

Permission is accordingly hereby granted * * * to file Federal income tax returns on the accrual basis in accordance with the books effective for 1937, thereby abandoning the allocation of expenses to the various crops in process under the crop basis of reporting income, predicated on the agreement that no deduction shall be claimed or allowed for any deferred expenses which at present are allocated on the books to crops for 1937 and subsequent years. All deductible expenses be-

ginning with 1937 shall be deducted in the year in which incurred in determining the net income for a given taxable year.

In 1970 Ewa sold its assets to an unrelated company for $5 million. On its consolidated return for 1970, plaintiff reported a loss of $2,231,906.87 with regard to the sale. This loss was determined by subtracting $7,231,906.87, Ewa's adjusted basis in the assets sold, from the $5 million selling price. On audit the IRS fully allowed the loss. Plaintiff then found that in determining the adjusted basis of Ewa's assets it had failed to take into account $489,648.65 of expenses which had not been deducted under the 1937 agreement. These expenses had instead been capitalized on plaintiff's books. Plaintiff had in calculating its adjusted basis taken into account $1,250,000 of expenses which also had not been deducted under the 1937 agreement. The Government now contends Ewa should not have been allowed any basis adjustment on account of the crop expenses it was not able to deduct under the 1937 agreement. Plaintiff argues that although it could not deduct the expenses attributable to the 1935 and 1936 crops in 1937 or subsequent years, it was allowed to capitalize these expenses. The Government, on the other hand, claims that under the 1937 agreement Ewa's predecessor and Ewa permanently lost their ability to both capitalize and deduct these expenses.

Under section 41 of the Revenue Act of 1936 and Treasury Regulations 94, Art. 41–2, the Commissioner's permission had to be sought for a change in accounting method so that income would be clearly reflected for federal income tax purposes.[7] For ex-

---

**7.** Section 41 of the Revenue Act of 1936 provided:

"SEC. 41. GENERAL RULE.

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of

the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. (For use of inventories, see section 22(c).)"

Treasury Regulations 94, Art. 41–2 (1936 Revenue Act) provided in pertinent part:

"A taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such

ample, in the present case, had plaintiff deducted not only the 1937 crop expenses but also the 1935 and 1936 deferred crop expenses in 1937, there would have been a distortion of income to the Government's disadvantage. Thus the Commissioner properly required a method of accounting that would insure there was a clear reflection of income—he required the plaintiff to abandon the *deduction* of deferred crop expenses for 1935 and 1936 as a condition precedent to changing its accounting method. The Commissioner's letter, however, did not say that these very real expenses of the business could never be taken into account. The letter simply said, "that *no deduction shall be claimed* or allowed for any deferred expenses which at present are allocated on the books to crops for 1937 and subsequent years." [Emphasis supplied.] The Commissioner's concern under the governing statute and regulation was only with the clear reflection of income. To deny the taxpayer *any* mechanism for ever taking these expenses into account would not further this goal.

In 1970 section 1002 required that

> Except as otherwise provided in this subtitle, on the sale or exchange of prop-

erty the entire amount of the gain or loss, determined under section 1001, shall be recognized.[8]

Pursuant to section 1001, the loss realized upon the sale or other disposition of property is the excess of the adjusted basis of the property over the amount realized therefrom. Included in the adjusted basis of property under sections 1016(a) and 1011 are adjustments for expenditures properly chargeable to the capital account for which no deductions have been taken by the taxpayer. The issue we must decide is what was Ewa's adjusted basis in the assets sold.

The Internal Revenue Code provides that a taxpayer is entitled to a tax-free recovery of his capital investment.[9] Section 1001(a). On account of this it has long been recognized that there is a distinction between deductions and adjustments to basis (or cost). *Sullenger v. Commissioner*, 11 T.C. 1076 (1948); *Max Sobel Wholesale Liquors v. Commissioner*, 630 F.2d 670 (9th Cir. 1980). Although a deduction may have an effect similar to that of an adjustment to basis, there often are differences. In this case a deduction of the deferred 1935 and 1936 crop costs in 1937 would have resulted

new method for purposes of taxation, secure the consent of the Commissioner. For the purposes of this article, a change in the method of accounting employed in keeping books means any change in the accounting treatment of items of income or deductions, such as a change from cash receipts and disbursements method to the accrual method, or vice versa; a change involving the basis of valuation employed in the computation of inventories (see articles 22(c)–1 to 22(c)–8); a change from the cash or accrual method to the long-term contract method, or vice versa; a change in the long-term contract method from the percentage of completion basis to the completed contract basis, or vice versa (see article 42–4); or a change involving the adoption of, or a change in the use of, any other specialized basis of computing net income such as the crop basis (see articles 22(a)–7 and 23(a)–11). Application for permission to change the method of accounting employed and the basis upon which the return is made shall be filed within 90 days after the beginning of the taxable year to be covered by the return. The application shall be accompanied by a statement specifying the classes of items differently treated under the two methods and specifying all amounts which

would be duplicated or entirely omitted as a result of the proposed change. Permission to change the method of accounting will not be granted unless the taxpayer and the Commissioner agree to the terms and conditions under which the change will be effected."

**8.** Section 1002 has since been repealed by Pub.L. 94–455, Title XIX, § 1901(b)(28)(B)(i), Oct. 4, 1976, 90 Stat. 1799. Its provisions are now contained in section 1001(c).

**9.** Section 1001(a) provides:

"§ 1001. *Determination of amount of and recognition of gain or loss.*

"(a) *Computation of gain or loss.*—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized."

There may be a constitutional right to deduct the cost of property from the sales price in computing taxable gain. *See* B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 5.4 (1981).

in a reduction of ordinary income. By capitalizing the expenses rather than deducting them, plaintiff almost 35 years later is limited to a capital loss. A corporation under section 1211 may only deduct capital losses from capital gains. It is limited to carrying the loss forward 5 years and back three. Section 1212. Thus there is a real difference between the result of capitalizing the expenses concerned here and deducting them.

The Government contends Ewa could not capitalize the expenses of its sugar crop because inventory methods of accounting have never been approved for crops for federal income tax purposes. The plaintiff, however, is not attempting to use an inventory method of accounting. If it were using an inventory method of accounting, it would have treated the nondeductible expenses as cost of goods sold and would have taken them into account upon the sale of the sugar crop the expenses related to. This was not done. Plaintiff has simply capitalized these nondeductible expenses as costs of its business.

Ordinary and necessary expenses made for a business or the production of income are in the usual case presently deductible under sections 162 and 212. Code section 263, however, places a limitation upon the deduction of these expenses. It specifies certain categories of expenditures for which no deductions shall be allowed, that shall be considered capital expenditures. Capitalized expenses are added to the basis of the acquired or improved property. Section 1016(a). They are then taken into account for federal income tax purposes either through depreciation in instances where property is subject to wear or upon the sale of the asset. Sections 167, 1016(a)2, 1011, 1001. *See Commissioner v. Idaho Power Co.,* 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974). If a project is abandoned, capitalized costs are also recognized. For example, in *Empire District Electric Co. v. Commissioner,* 4 T.C. 925 (1945), costs incurred for surveys, engineering work, legal fees, and license applications in preparation for construction of a hydroelectric power plant were not deductible when incurred; how-

ever, the taxpayer was allowed to recognize a loss upon its abandonment of the project in a subsequent year. *See also* Rev.Rul. 67–113, 1967–1 Cum.Bull. 55. Where capitalized items are abandoned as a result of a sale of section 1231 assets rather than taking a deductible loss, the basis of the abandoned items is added to the basis of the property sold to determine the taxpayer's gain or loss. *Southern Pacific Transportation v. Commissioner,* 75 T.C. 497, 586–605 (1980). Legitimate business expenses are therefore always taken into account in the computation of gross income, whether at the present time or at a later time.

The present case poses a somewhat unique situation but we find the principle of tax recognition of capitalized costs equally applicable. The Congressional limitation of section 263 did not deny plaintiff's deduction here. Instead, plaintiff was not allowed to deduct its expenses by order of the Commissioner. We do not find this makes a meaningful difference. Although the capitalized expenses related to crops that were not physically sold in 1970, they were legitimate expenses that had been incurred in the operation of the sugar business. As such, they were costs that were necessary to the continued successful operation of the business.

The Government contends this case is similar to *Kahuku Plantation Co. v. Commissioner,* 132 F.2d 671 (9th Cir. 1942). We find that case inapplicable. In *Kahuku* the taxpayers wanted to change their accounting method to the extent of charging all of the indirect expenses on the annual accrual basis rather than the crop cost method. The Commissioner agreed to let the taxpayers do this on the condition

> * * * the taxpayers express their willingness to exclude from deductions for the year of change and subsequent years the indirect charges which have been deferred under the method of allocating such costs to crops in process, and to confine the deductions for indirect charges for the year of change and subsequent years to those actually accruing

within the given taxable year, excluding any deductions previously claimed in prior years. [*Id.* at 672–673.]

The taxpayers assented to the condition and on August 28, 1936, the Commissioner granted the taxpayers permission. During 1935 the taxpayers had entered into an agreement with the Secretary of Agriculture to produce a certain amount of sugar to be held in emergency reserve. This emergency reserve sugar was sold in 1936. The taxpayers attempted to *deduct* the expenses that had been deferred on the 1935 crop in the year 1936, contending the agreement did not apply to the 1935 emergency reserve crop costs.[10] The court interpreted the language of the specific agreement as covering the deferred 1935 cost on the emergency reserve sugar. It therefore held that taxpayers were not permitted to *deduct* these costs in the 1936 taxable year. The court found the taxpayers had bound themselves by their agreement to abandon these particular deductions. It held that although the agreement might result in a distortion of income, taxpayers were bound by the agreement they had made. In our case plaintiff is not attempting to deduct crop costs it has agreed not to deduct. We do not interpret the agreement at issue as forbidding plaintiff from capitalizing these costs and taking them into account upon the sale of the business assets. The *Kahuku* case is therefore inapplicable.

We emphasize that plaintiff here is not seeking a double tax benefit or a windfall of any kind. In fact, to forbid capitalization and tax recognition of the expenses at issue would result in a windfall to the Government. These expenses were legitimate expenses of the business of the sugar plantation. The agreement with the Commissioner did not forbid the plaintiff from taking these expenses into account. The agreement merely forbade the plaintiff from deducting the expenses. We therefore hold that plaintiff properly capitalized the expenses at issue and that they should be added to the basis of Ewa's assets for purposes of determining the loss upon the sale of the business.[11]

IV

In conclusion we hold as follows:

1. When consolidated returns are filed, WHTC deductions should be determined by either the aggregate method with losses or the fractional method with losses. The method prescribed by regulation § 1.1502–25(c) is invalid in so far as it does not consider net losses. We therefore grant summary judgment in favor of both Allied Corporation and Reynolds Metals Company. This portion of the opinion is remanded to a trial judge under Rule 131(c) for a determination of the amount of the tax refund both corporations shall receive under the holding of this opinion.

2. (a) The method of carrying back and carrying forward net operating losses specified in Treas.Reg. § 1.1502–79(a) is the proper method to use where a WHTC corporation is involved. We therefore hold that Treas.Reg. § 1.1502–79(a) and either the aggregate method with losses or the fractional method with losses should be used to determine plaintiff Castle & Cooke's WHTC deduction for the years in question. We grant partial summary judgment in favor of Castle & Cooke in this regard.

---

10. The Ninth Circuit opinion speaks both in terms of inventorying the 1935 emergency reserve sugar costs and deducting them. As the Government has pointed out in our case, the IRS did not accept inventory methods of accounting for crops during the years concerned. 1 L. Schneider, Federal Income Taxation of Inventories, Sec. 1.03[10] (1981); *Commissioner v. South Lake Farms, Inc.*, 324 F.2d 837 (9th Cir. 1963). Thus it appears taxpayers in *Kahuku* were attempting to *deduct* the expenses at issue.

11. In its motion for partial summary judgment, plaintiff Castle & Cooke raised two additional arguments to which the Government has conceded. The first is that plaintiff is entitled to section 243(a)'s 85 percent dividends received deduction for the taxable year 1972 with respect to dividends received from California and Hawaiian Sugar Co., Inc. The second is that plaintiff is entitled to $37,026 in additional foreign tax credits for 1970 and any additional creditable foreign taxes plaintiff may prove at trial.

(b) Castle & Cooke is entitled to include the deferred crop expenses from 1935 and 1936 in the basis of the assets sold by Ewa Sugar for purposes of determining its loss on the sale. We grant partial summary judgment in favor of Castle & Cooke in this regard.

(c) These portions of Castle & Cooke's case are remanded to a trial judge under Rule 131(c) for a determination of the amount of the refund plaintiff Castle & Cooke is entitled to under this opinion. The amount of refund shall include amounts the Government has conceded as to the section 243 deduction and the foreign credit as specified in footnote 11 of this opinion. Since not all the issues raised by the parties are before us on this motion for partial summary judgment, the amount of refund plaintiff is entitled to under this opinion is subject to offset by claims the Government may prove at trial and increase by claims the plaintiff may prove at. trial.