**RITE AID CORP. and Subsidiary Corps., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 98–492 T.**

United States Court of Federal Claims.

April 21, 2000.

Bernard John Williams, Jr., Washington, DC, for plaintiff.

Stuart J. Bassin, with whom were Loretta C. Argrett, Assistant Attorney General, Mildred L. Seidman, Chief, Court of Federal Claims Section, United States Department of Justice, Washington, DC, for defendant.

*OPINION*

HEWITT, Judge.

Plaintiffs, Rite Aid Corporation, on its own behalf and as the common parent of an affiliated group of corporations that files consolidated federal income tax returns under Internal Revenue Code (I.R.C. or the Code) §§ 1501—1505 (individually or collectively, as the context requires, Rite Aid), seek a refund of federal income tax payments under I.R.C. § 7422, together with interest due under I.R.C. § 6611, for the tax year ending March 4, 1995.[1] Rite Aid's consolidated return claimed a loss on the sale of the stock of its subsidiary, Penn Encore, Inc. (Encore or the subsidiary), in the amount of $33,416,673. The Secretary of the Treasury (the Secretary) disallowed the loss on the authority of Treasury Regulation (Treas.Reg.) § 1.1502–

20 that "[n]o deduction is allowed for any loss recognized by a member with respect to the disposition of stock of a subsidiary." Treas. Reg. § 1.1502–20(a). Rite Aid paid the tax due and timely filed a claim for refund in the amount of $10,411,888 plus interest. The refund claim was denied in 1998. Rite Aid then sued for a refund in this court, claiming that the denial of the refund was erroneous and illegal. The sole issue to be decided is Rite Aid's challenge to the propriety of Treas. Reg. § 1.1502–20 (sometimes referred to as the Regulation). Both parties moved for summary judgment. The issue has been fully briefed and argued. Because the court finds that Treas. Reg. § 1.1502–20 was a proper exercise of the Secretary's regulatory authority, the government's Motion for Summary Judgment is granted; Rite Aid's Motion for Summary Judgment is denied.

## I. Background

Plaintiffs' name is commonly associated with its drugstore business. However, from the late 1960s to the mid–1990s, plaintiffs owned numerous non-drugstore businesses, including wholesale food distribution, auto parts, and dry cleaning. Plaintiffs' Proposed Findings of Uncontroverted Fact at ¶ 3. During the 1980s in particular, Rite Aid management had concerns about the growth potential and future of the drug store industry. *Id.*

While Rite Aid was actively looking for other retailing businesses to acquire during 1983 and 1984, it learned of Encore, a small discount bookstore chain having some 15 to 23 outlets which offered discounts from manufacturer's suggested prices, a then unique practice among booksellers. *Id.* at ¶¶ 4–5. Rite Aid viewed Encore as having significant growth potential. *Id.* at ¶ 5. Rite Aid acquired 80% of Encore stock in 1984 by stock purchase (treated as an asset sale by Rite Aid under I.R.C. § 338) for $3 million. Rite

---

1. The facts in this paragraph are as set forth in Rite Aid's Complaint filed June 10, 1998. There are various monetary matters in dispute, all fully reflected in the parties' proposed findings of uncontroverted fact, statements of genuine issues, and responses thereto. The parties agreed at oral argument that the details of these disputes would affect two other loss disallowance issues which are moot if the court upholds the duplicated loss provision of Treas. Reg. § 1.1502–20. Transcript of oral argument on cross-motions for summary judgment held on February 1, 2000(Tr.) at 97–98.

Aid purchased the balance of Encore stock in 1988 for $1.5 million. *Id.* at ¶ 6. Beginning immediately after the 1984 stock purchase, Rite Aid included Encore in its affiliated group of corporations for the purpose of filing consolidated tax returns. *Id.* at ¶ 13. After it completed its purchase of Encore stock in 1988, Rite Aid calculated its cost basis in the stock at $4,659,730, including the stock purchase prices of $3 million and $1.5 million and tax on the deemed asset sale treatment of the initial purchase in the amount of $159,730. *Id.*

Immediately after the initial 1984 closing of the stock purchase, Rite Aid allocated to Encore's assets the amount of the "adjusted grossed-up basis" as required under I.R.C. § 338 and applicable Treasury Regulations. That basis amount, as calculated by Rite Aid, was approximately $8.4 million. *Id.* at ¶ 14. Thereafter, Rite Aid annually adjusted its basis in the Encore stock to take account of Encore's earnings and profits (E & P). *Id.* at ¶ 16. Encore experienced a net negative E & P from 1985 to 1994 of approximately $10.9 million. *Id.* Over the same period, Encore borrowed approximately $44.9 million from Rite Aid. *Id.* at ¶ 17.

In 1994, in response to declining Rite Aid stock prices, Rite Aid management adopted a restructuring plan which included, among other things, the sale of Encore and several other non-drug-store businesses. *Id.* at ¶¶ 8–9. Rite Aid management asked prospective bidders whether they would be amenable to making an election under I.R.C. § 338(h), a provision affording asset sale treatment for certain stock sales. *Id.* at ¶ 10. The only bidder for Encore refused to make a § 338(h) election. *Id.* Both the bidder, Lauriat's, Inc., and its parent, CMI Holding Corp. (CMI), are unrelated to Rite Aid. *Id.* at ¶ 11.

The sale of Encore stock closed on November 23, 1994, with Rite Aid receiving $18 million in cash, less closing adjustments, plus warrants for the purchase of CMI stock. *Id.* Rite Aid's net expenses for the sale were some $1.3 million. *Id.* As part of the closing, Rite Aid contributed the $44.9 million debt owed to it by Encore to capital, thereby increasing Rite Aid's basis in Encore stock

by that amount. *Id.* at ¶ 17. Based on the foregoing, Rite Aid asserts that it suffered an economic loss on the sale of Encore stock of more than $22 million. *Id.* at ¶¶ 17–18.

Rite Aid complains that Treas. Reg. § 1.1502–20(a) denied it the recognition of its losses on the sale of Encore stock because Encore was a member of an affiliated group of corporations filing a consolidated return. *Id.* at ¶ 19. Encore calculates its "duplicated loss" disallowed under Treas. Reg. § 1.1502–20 at approximately $28.5 million, being the aggregated adjusted basis of Encore's assets in the amount of $52.4 million less the value of Encore's stock plus liabilities. *Id.* at ¶ 23. Because the $28.5 million disallowed as "duplicated loss" exceeded Rite Aid's claimed $22 million of "economic loss," Treas. Reg. § 1.1502–20 denied Rite Aid any loss deduction on the sale. *Id.* at ¶ 24. Rite Aid timely paid the tax the Internal Revenue Service (IRS) deemed to be due with respect to the stock sale and filed a refund claim. *Id.* at ¶¶ 28–29. After the IRS denied its refund claim, Rite Aid filed its claim in this court seeking a tax refund of $7,747,831, plus interest. *Id.* at ¶¶ 30–31.

## II.  Discussion

### A.  Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Rule of the Court of Federal Claims (RCFC) 56(c); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed.Cir.1998) (quoting RCFC 56(c)). In a tax refund suit, the taxpayer has the burden of establishing entitlement to the specific refund amount claimed. *See Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed.Cir.1998). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine factual dispute exists between the parties in this case and the legal dispute on the relevant law is appropriate for summary judgment.

B. Treas. Reg. § 1.1502–20

1. Text of the Regulation

Treasury Regulation § 1.1502–20 is titled "Disposition or deconsolidation of subsidiary stock" and provides, in pertinent part:

(a) Loss disallowance—(1) General rule. No deduction is allowed for any loss recognized by a member with respect to the disposition of stock of a subsidiary. . . .

(2) Disposition. Disposition means any event in which gain or loss is recognized, in whole or in part.

Treas. Reg. § 1.1502–20(a)(1)–(2).

The general rule of loss disallowance contained in subsection 1.1502–20(a) of the Regulation is limited by subsection (c), which introduces and defines the concept of "duplicated loss," the issue to be discussed in this case. Subsection (c) provides, in pertinent part:

(c) Allowable loss—(1) General rule. The amount of loss disallowed under paragraph (a)(1) of this section and the amount of basis reduction under paragraph (b)(1) of this section with respect to a share of stock shall not exceed the sum of the following amounts—

(i) Extraordinary gain dispositions. . . .

(ii) Positive investment adjustments. . . .

(iii) Duplicated loss. The amount of duplicated loss with respect to the share.

(2) Operating rules. For the purposes of applying paragraph (c)(i) of this section—

. . . .

(vi) Duplicated loss. "Duplicated loss" is determined immediately after a disposition or deconsolidation, and equals the excess (if any) of—

(A) The sum of—

(1) The aggregate adjusted basis of the assets of the subsidiary other than any stock and securities that the subsidiary owns in another subsidiary, and

(2) Any losses attributable to the subsidiary and carried to the subsidiary's first taxable year following the disposition or deconsolidation, and

(3) Any deferred deductions (such as deductions deferred under section 469) of the subsidiary, over

(B) The sum of—

(1) The value of the subsidiary's stock, and

(2) Any liabilities of the subsidiary, and

(3) Any other relevant items.

*Id.* § 1.1502–20(c).

For the purpose of this case, the duplicated loss which the Secretary has disallowed by the foregoing regulatory framework is the net potential tax benefit associated with Encore's stock in the hands of Encore's unrelated purchaser, arising out of the excess of the corporation's basis in its assets, loss carryforwards and deferred deductions over the purchase price plus any assumed liabilities. *See* Ps' MSJ at 10. That amount, according to Rite Aid's calculation, was about $28.5 million. *See id.* The Secretary's disallowance of the duplicated loss eliminated all of Rite Aid's claimed economic loss of $22 million. *See id.* at 11.

2. Code Provisions

The Regulation was promulgated by the Secretary in connection with Code sections 1501 through 1505 which provide for the filing of consolidated tax returns by certain affiliated groups of corporations. The consolidated return provisions are an exception to the general rule that each taxpayer has the responsibility to file his, her or its separate return. The portion of the Code which establishes the consolidated return regime contemplates a regulatory framework unique to consolidated return filers to which corporations availing themselves of the privilege of filing consolidated returns are deemed to consent:

The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a

consolidated return shall be considered as such consent.

I.R.C. § 1501.

The next section of the Code sets out in detail the authority of the Secretary to draft implementing regulations. The authority extends by its terms both to the affiliated group of corporations and to each corporation in the group both during and after the time periods covered by consolidated returns:

> The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

*Id.* § 1502.

### 3. Rite Aid's Complaint About the Regulation

According to Rite Aid, "The fundamental abuse of Treasury Regulation § 1.1502–20 is that it permanently denies to a corporate shareholder the benefit of the loss on its investment in its subsidiary without furthering the purposes of clearly reflecting tax liability or preventing tax avoidance." Plaintiffs' Motion for Summary Judgment (Ps' MSJ) at 14. In particular, Rite Aid complains that the Regulation is in derogation of Code § 165(a) which allows a deduction for a "loss sustained during the taxable year and not compensated for by insurance or otherwise." *Id.* (quoting I.R.C. § 165(a)). Rite Aid argues that the losses included within § 165(a) included "loss[es] on the sale or exchange of property, including the sale or exchange of stock in a corporation." *Id.* Rite Aid views losses on stock sales as an "elementary component of the fundamental concept of 'taxable income' on which the Code imposes tax liability." *Id.* at 15. The Secretary must, in Rite Aid's view, "abide by the operative provisions of the Code." *Id.* at 16. Because the Secretary has "disregarded these constraints," Rite Aid argues that he has exceeded his authority in promulgating the Regulation. *Id.*

Rite Aid's chief authorities for this argument are three Federal Circuit precedents, *American Standard, Inc. v. United States,* 220 Ct.Cl. 411, 602 F.2d 256 (1979); *Union Carbide Corp. v. United States,* 222 Ct.Cl. 75, 612 F.2d 558 (1979); and *Allied Corp. v. United States,* 231 Ct.Cl. 283, 685 F.2d 396 (1982); and the Supreme Court case of *Charles Ilfeld Co. v. Hernandez,* 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127 (1934). Ps' MSJ at 12–13, 26; Plaintiffs' Reply at 6. Rite Aid cites *Union Carbide* in support of the proposition that "Code § 1502's delegation *does not include* the discretion to deny the Code's benefits without furthering the purposes of that section." Ps' MSJ at 13 (citing *Union Carbide,* 612 F.2d at 563). According to plaintiffs, the purposes of the Code § 1502 which the Secretary may permissibly support are "clearly reflecting tax liability" or "preventing tax avoidance." Ps' MSJ at 14. While recognizing that "situations arise in which the consolidated return regulations will necessarily modify the effect of certain operative provisions of the Code within the group to ensure the clear reflection of tax liability and to prevent the avoidance of such liability," Rite Aid's position is that § 1502 of the Code "does not authorize the Secretary to choose a method that imposes a tax on income that categorically would not otherwise be taxed." Ps' MSJ at 18 (quoting *Union Carbide,* 612 F.2d at 563).

### 4. Standard of Review

The parties both recognize that the Regulation was promulgated under the specific authority of Code § 1502 and is properly characterized as a "legislative regulation" which, as Rite Aid puts it, "delegates legislative authority to the Secretary as broadly as is legally permissible." Ps' MSJ at 13; *see also* Defendant's Motion for Summary Judgment (D's MSJ) at 26. While recognizing that a decision whether the regulation is a "choice among 'reasonable interpretations is for the Commissioner, not the courts,'" Ps' MSJ at 13 (citing *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 488, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979)), Rite Aid

invites the court to focus on the "reasonableness" of the regulation. However, in a case cited by plaintiff, the Court of Claims acknowledged that "there may be many reasonable methods to determine a group's tax liability and the Secretary's authority is absolute when it represents a choice between such methods." *Union Carbide,* 612 F.2d at 563. The government cites *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) for the proposition that legislative regulations are valid unless "arbitrary, capricious, or manifestly contrary to the statute." D's MSJ at 25 (citing *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778). In light of the Federal Circuit's recent decision in *Schuler Indus. v. United States,* 109 F.3d 753 (Fed.Cir.1997), a case involving a challenge to legislative regulations governing the corporate alternative minimum tax, the court finds the government's articulation of the standard of review to be appropriate for this case. *See Schuler,* 109 F.3d at 755 (regulation valid where Secretary did not act "arbitrarily or capriciously, or manifestly contrary to the statute").

5.  Review of Treasury Regulation § 1.1502–20 to Determine Whether it is Arbitrary, Capricious or Manifestly Contrary to Law

The court believes that this case can be resolved on the basis of the plain meaning of I.R.C. § 1502, the statute under which the Regulation was promulgated. That statute authorizes the Secretary to promulgate regulations which affect the tax liability of both of "any affiliated group of corporations making a consolidated return" and of "each corporation in the group." I.R.C. § 1502. Section 1502 further provides that such regulations may affect the group or each corporation "both during and after the period of affiliation." *Id.* Regulation § 1.1502–20 appears to the court to fall well within the four corners of section 1502, affecting as it does the tax liability of the affiliated group with respect to a matter arising because of the disaffiliation of one of its members. The duplicated loss rule in the Regulation prohibits the opportunity that would exist—without the Regulation—for the affiliated group to recognize a loss on a sale of stock of a subsidiary and for the purchaser to recognize the same loss. By prohibiting the use of the same loss in the hands of both seller and purchaser, the Regulation assists in achieving the purpose of all regulations issued under I.R.C. § 1502 "clearly to reflect the income-tax liability" of both members and former members of the affiliated group and to "prevent avoidance of such tax liability." I.R.C. § 1502.

The court's view of the plain meaning of the statute is not altered by plaintiffs' arguments. The court does not agree that the effect of the Regulation is in derogation of § 165(a) of the Code, which affords the taxpayer a deduction for a "loss sustained during the taxable year and not compensated for by insurance or otherwise." *Id.* § 165(a). In this case, plaintiffs had an opportunity, which they did not avail themselves of, to structure the sale transaction for the subsidiary in a way which would have allowed Rite Aid to recognize the losses disallowed by the duplicated loss rule. Rite Aid could have structured the sale as a sale of Encore's assets, a structure which would have allowed Rite Aid to recognize loss on the difference between the sale price and Rite Aid's basis in Encore's assets. Rite Aid could even have structured the sale as a sale of stock, subject, however to the requirement that both seller and buyer elect to treat the transaction as an asset sale for tax purposes under I.R.C. § 338(h)(10). In addition, because of the possible value to the buyer of the losses (a value which was acknowledged, although to an unknown quantity, by plaintiffs' counsel at oral argument, Tr. at 16–17), the court does not believe that the loss sustained by the seller is not "compensated for" in some fashion ("or otherwise") as contemplated by I.R.C. § 165(a). Rite Aid itself chose a structure for a sale of a business it wished to divest. As the Supreme Court has noted, "[A] taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice ... and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974).

Nor does the court agree with Rite Aid that the rule announced by the Supreme

Court in *Ilfeld* sheds light on the duplicated loss rule at issue in this case. *See* Ps' MSJ at 26 (citing *Ilfeld*, 292 U.S. 62, 54 S.Ct. 596). *Ilfeld* involved sequential intercompany transactions within the affiliated group occurring within the consolidated return period. *Ilfeld*, 292 U.S. at 67–69, 54 S.Ct. 596. The taxpayer attempted to characterize the transactions as occurring outside the consolidated return period. *Id.* at 68, 54 S.Ct. 596. The court disagreed. *Id.* Rite Aid argues that *Ilfeld* stands for the proposition that, in the Supreme Court's view, a duplicated loss is "a loss twice enjoyed by the group." Ps' MSJ at 26. In Rite Aid's view, the *Ilfeld* case reflects "the dual perspective of taxing the consolidated group as a single business while preserving the separateness of each corporation in the consolidated group." *Id.* at 27. The Code, in § 1502, expresses as the purpose of the implementing regulations that they "clearly ... reflect ... income-tax liability" with respect to both the affiliated group and any corporation in the group, "both during and after the period of affiliation." I.R.C. § 1502. This purpose appears to the court to be served by prohibiting to the group losses which otherwise might be taken both by the group and its former member.

Finally, the Federal Circuit precedent cited by plaintiffs is inapposite to this case. The plaintiff in *American Standard* sought to recover overpayments of federal income taxes on a consolidated return which it believed resulted from an improper calculation by the Secretary of a deduction for Western Hemisphere trade corporations (WHTCs) then contained in I.R.C. §§ 921–922. *See American Standard*, 602 F.2d at 259.

While plaintiffs are correct that the *American Standard* court found the Treasury Regulation affecting WHTCs invalid, the Secretary's actions in promulgating that regulation stand in stark contrast to the facts of the Secretary's actions in the case before this court. In *American Standard*, the Secretary did not provide any statement of the basis and purpose for the regulation. *See id.* at

261. The court specifically noted, "The reason the lack of a rationale renders a regulation invalid is that a court cannot evaluate the reasonableness of a regulation without a statement of the purpose and basis." *Id.* at 269. Moreover, the *American Standard* court was particularly persuaded that in view of the "conceptual basis upon which Congress permitted the deduction ... [the regulation] clearly defeats this intended inducement to American business...." *Id.* at 265. In contrast to *American Standard*, the Secretary in the case before the court fully explained the purpose and rationale for the duplicated loss rule. Numerous preambles and proposed regulations were published and shaped by the administrative process. *See, e.g.,* 1990–1 C.B. 66; 1990–2 C.B. 696.[2]

### III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED. Defendant's Motion for Summary Judgment is GRANTED. The Clerk of the United States Court of Federal Claims shall enter judgment for the United States. Each party shall bear its own costs.

IT IS SO ORDERED.

---

**2.** Plaintiffs also cite *Union Carbide* and *Allied* as support for their argument. Ps' MSJ at 13. However, both of these cases merely follow the

*American Standard* decision and do not add any additional weight to its argument. *Union Carbide,* 612 F.2d at 564; *Allied,* 685 F.2d at 400.